# ORIGINAL

OCT 19 2005

OCT 19 2005

Page 1

1          SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2     UNITED SHEET METAL, INC. :

3        Plaintiff              :

4           Vs.                 : Case No.:

5     EFS XI, INC., ET AL       :  04CA604942

6        Defendants             :

7               ---------------------

8

9            Deposition of GREGORY E. HARRAKA, was

10    taken on Monday, October 3, 2005, commencing at

11    10:03 a.m., at Whiteford, Taylor & Preston, 1025

12    Connecticut Avenue, N.W., Suite 400, Washington,

13    D.C., before MICHELE D. LAMBIE, Notary Public.

14               ---------------------

15

16

17

18

19

20    Reported By:

21             Michele D. Lambie, CSR-RPR

**EXHIBIT**

tabbies

3

*Art Miller* & ASSOCIATES L.L.C.

COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883    WASHINGTON FAX: 202-234-8467
www.artmiller.com

Page 150

1   August 25th, 2005 where the back-charges of Coakley

2   Williams were presented, had there been any other

3   meetings where back-charges were the subject of

4   discussion?

5       A.   No.

6       Q.   Can you turn to Mr. Richardson's Exhibit

7   Number 90?  It's my understanding from

8   Mr. Richardson's testimony that this list of

9   back-charges was handed to Limbach at the meeting

10  on August 25th, 2005; is that correct?

11      A.   Yes.

12      Q.   Does Coakley believe that that

13  constitutes a formal transmission of the

14  back-charges to Limbach?

15      A.   They were handed to him as part of a

16  discussion, yes.

17      Q.   So does Coakley contend that these

18  back-charges have now been formally assessed

19  against Limbach?

20      A.   Not formally assessed, no, but part of

21  the discussion of the settlement of the contract.

Page 151

1      Q.   Before the meeting on October 25th, 2005,

2   had any of these back-charges been asserted?

3      A.   No.

4      Q.   Attached to this on the second page of

5   this exhibit there's an explanation of the

6   different back-charges, and again, there's some

7   handwritten notes that I understand are

8   Mr. Richardson's.  Do you know who prepared these

9   handwritten, this explanation of these

10  back-charges?

11     A.   David Woodyard.

12     Q.   Did you review this back-charge

13  computation and the explanation of the issues?

14     A.   Just briefly.

15     Q.   If you look at item 1, repainting work,

16  it's a total of $49,618.  Is it Coakley's position

17  that United Sheet Metal is responsible for this

18  particular back-charge?

19     A.   I don't know who is responsible, other

20  than Limbach.

21     Q.   Why does Coakley believe Limbach is

Page 152

1    responsible?

2        A.    There was a bunch of work that had to be

3    re-done in the BEQ relating to valves.  There was

4    diffuser issues in the BEQ ceilings which resulted

5    in re-work having to be done, so it was Limbach or

6    their subcontractors who were responsible for going

7    back in those ceilings and tearing them up and

8    having the re-work to be done.

9        Q.    Before this re-work was done, was there

10   any written notification provided to Limbach?

11       A.    I think it's an ongoing process that was

12   occurring at the time.

13       Q.    Did --

14       A.    They go in the ceiling; it has to be

15   re-done.

16       Q.    Well, was Limbach given any written

17   notification that there was some aspect of work

18   that was going to have to be re-done?

19       A.    I'm sure there is something in the file.

20       Q.    Item number 2 relates to final clean-up

21   PJ services, additional final cleaning work in the

Page 153

1  amount of $31,874.  The same question.  Does

2  Limbach believe that United Sheet Metal is

3  responsible for -- excuse me.  Let me rephrase that

4  question.

5       Does Coakley Williams believe that United

6  Sheet Metal is responsible for any of these

7  clean-up costs?

8       A.    Yes.

9       Q.    Why does Coakley Williams believe that?

10      A.    That Limbach is responsible?  Because

11  they had to go back in to do some of this re-work,

12  which resulted in a mess, which resulted in us

13  having to re-clean the building.

14      Q.    Was Limbach provided any notification

15  that this additional cleaning work was going to

16  have to be performed because of Limbach's work?

17      A.    It was actually that Limbach notified us

18  that their work was not in compliance and that they

19  had to go back and fix it prior to us doing the

20  initial final cleaning.  No, they did not.

21      Q.    Well, but my question was did Coakley



Page 154

1    provide any notification to Limbach that they were

2    going to perform this additional final-cleaning

3    work because of Limbach?

4        A.    How they were notified, I'm not sure.  I

5    know there was a discussion about it.  The building

6    was completed, and then it was determined that

7    Limbach's work was not in compliance, and they had

8    to go back in, tear the ceilings open, redo a bunch

9    of things, which then resulted in us having to

10   re-clean the building.

11       Q.    Those bunch of things are the items that

12   you talked about with respect to item 1, the

13   repainting work?

14       A.    Various things.

15       Q.    Before you referenced relating to valves,

16   diffusers issues.  Was there anything else besides

17   valves and diffuser issues?

18       A.    I would have to review the record to see

19   exactly what was re-done.  There was balancing

20   issues.  There were duct changes.  There were

21   revisions.  There's multiple things that went on

Page 155

1   through July and August to get the building

2   completed.

3       Q.   Item 3 relates to additional project

4   clean-up, safety, labor costs, etcetera, and it

5   looks like you take a difference between Coakley's

6   budgeted amount and actual cost, which is

7   $56,784 -- excuse me.  It looks like you take the

8   difference between Coakley's actual cost of

9   $481,459 and Coakley's budgeted cost of $56,784 and

10  multiply that difference by 30 percent to arrive at

11  a back-charge amount of $127,402?

12          MR. SHEAN:  Multiplied or divided?

13          MR. JONES:  Multiplied or divided by 30

14  percent, same thing.

15          THE WITNESS:  Yeah, divided by a third.

16      Q.   Who determined that 30 percent of these

17  costs should be attributable to Limbach?

18      A.   I believe David Woodyard did by virtue of

19  the size of Limbach's contract.

20      Q.   You mean because Limbach's contract was

21  30 percent of Coakley's entire package, 30 percent

Page 156

1 of the cost should be attributed to Limbach?

2  A. That's generally how it's done from a

3 point of discussion.

4  Q. To your knowledge, was there any written

5 notification provided to Limbach before this

6 back-charge sheet was given to them that Limbach

7 was going to be charged any money for project

8 clean-up, safety, labor cost, etcetera?

9  A. I'm sure there was, and I just have to

10 check the file as to when it was specifically.

11  Q. Item 4 is extended general condition

12 costs.  Total GCs to date $2,409,218.  The budget

13 was $1,494,134.  The difference was $914,084.

14 Multiply this by 40 percent, to come up with a

15 back-charge amount of $366,033.

16  The first question is why in item 4 is

17 Limbach being assessed general conditions at 40

18 percent of the overrun and then in item 3 Limbach

19 is being assessed 30 percent of the overrun for the

20 clean-up cost?

21  A. I would have to ask David why he put that

Art Miller & ASSOCIATES L.L.C.
COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883    WASHINGTON FAX: 202-234-8467
www.artmiller.com

Page 157

1   difference in there.

2       Q.   Has there been any analysis done by

3   Coakley to determine -- strike that.

4            Let me ask it this way:  What period of

5   time does Coakley contend these general condition

6   costs are for?

7       A.   Throughout the latter part of the

8   project.

9       Q.   Does Coakley contend these general

10  condition costs are from the period January 4th,

11  2004 to August 6, 2004?

12      A.   It's for work that was not maintaining

13  the project schedule from probably sometime in 2003

14  through the end of the project.

15      Q.   How many days of general condition cost

16  does Coakley believe Limbach is responsible for?

17      A.   I would have to have a discussion with

18  David about it.

19      Q.   Has there been any analysis by Limbach to

20  determine how many days of general conditions

21  Coakley believes Limbach is responsible for?

Page 158

1          MR. CARNEY:  Objection.

2          THE WITNESS:  You asked if Limbach had?

3     Q.   Excuse me.  Has there been any analysis

4  by Coakley to determine how many days of general

5  conditions Coakley believes Limbach is responsible

6  for?

7     A.   Not at this time.

8     Q.   Now, it's my understanding that the

9  January 4th, 2004 completion date was extended to

10  sometime in March 2004 by contract modification?

11     A.   Right.

12     Q.   Does Coakley contend that Limbach is

13  responsible for any general condition costs between

14  January 2004 and March of 2004?

15     A.   They might be responsible for some of it,

16  yes.

17     Q.   And then there were these agreements that

18  extended the contract completion date first to June

19  30th, 2004 and then to July 31st, 2004.  Does

20  Coakley contend that Limbach is responsible for any

21  general condition costs during that time frame?



Art Miller & ASSOCIATES L.L.C.
COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883     WASHINGTON FAX: 202-234-8467
www.artmiller.com

Page 159

1      A.    Yes.

2      Q.    Earlier we saw a modification that

3   reflected your general condition costs that were

4   submitted in an owner-delay claim analysis.  Do you

5   recall that number?

6      A.    I remember you showed it to me.  It's an

7   Exhibit.

8      Q.    And when you did the computation, you

9   determined that the Coakley general condition costs

10  were roughly $2,700 a day?

11     A.    Something to that effect, yeah.

12     Q.    Is that how much Coakley believes its

13  general condition costs are for this particular

14  back-charge?

15          MR. SHEAN:  You mean the rate?

16          THE WITNESS:  The $2,700 a day?

17     Q.    Yes.

18     A.    I don't know how David calculated that,

19  but it's probably close to it.  I mean, the costs

20  are actual costs, so.

21     Q.    In order for Limbach to be responsible

Page 160

1    for these extended general conditions, do you

2    believe Limbach's work had to delay the critical

3    path of the project?

4          MR. CARNEY:  Objection.

5          THE WITNESS:  Critical and non-critical

6    items extended the project.

7       Q.   To your knowledge, did Limbach's work

8    delay the critical path of the project?

9       A.   Yes.

10         MR. SHEAN:  At what point in time?

11      Q.   At any point in time during the course of

12   the project?

13      A.   Yes.

14      Q.   Now, let's narrow down the point in

15   times.  In 2003, did Limbach's work delay the

16   critical path of the project?

17      A.   In 2003?

18      Q.   Yes.

19      A.   What point in 2003?

20      Q.   In the beginning of 2003.

21      A.   I'd have to check the project record

1    exactly.

2        Q.   In the end of 2003, did Limbach's work

3    delay the critical path of the project?

4        A.   Yes.

5        Q.   In 2004, did Limbach's work delay the

6    critical path of the project?

7        A.   Yes.

8        Q.   Were there any other delays to the

9    critical path of the project in 2004?

10       A.   There were some.

11       Q.   Were there any other delays to the

12   critical path of the project in 2003?

13       A.   There might have been, yes.

14       Q.   Is it your belief that Limbach was the

15   sole cause of delays to the critical path of the

16   project in 2004?

17            MR. CARNEY:  Objection.

18            THE WITNESS:  No.

19       Q.   Is it your belief that Limbach was the

20   sole cause of the delays to the critical path in

21   2003?

Art Miller & ASSOCIATES L.L.C.
COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883    WASHINGTON FAX: 202-234-8467
www.artmiller.com

Page 162

1      A.    No.

2            MR. CARNEY:  Objection.  I'm sorry, I

3      didn't hear the answer.

4            THE WITNESS:  No.

5      Q.    Item Number 5 in the back-charge list is

6      Security, B and B Security, additional building

7      security, $29,414.  Why do you believe Limbach is

8      responsible for this back-charge?

9      A.    There are portions of the building they

10     could not close up because of the louvers that

11     Limbach was to provide that left the building open,

12     which required us to secure it through an outside

13     third party.

14     Q.    When did this -- when did these louvers

15     finally get installed?

16     A.    Whenever we were able to lock up the

17     building.

18     Q.    Were these louvers installed before

19     August 6th of 2004?

20     A.    Yes.

21     Q.    Were they installed before July 31 of

Page 163

1    2004?

2        A.    Yes.

3        Q.    Were they installed before June 30th of

4    2004?

5        A.    I believe so.

6        Q.    To your knowledge, did Coakley provide

7    Limbach any written notification that they would be

8    assessed a back-charge for additional building

9    security due to the missing louvers?

10       A.    I would have to check the records.

11       Q.    There is another item here, item 6, time

12   technologies back-charge, provide remote scoreboard

13   operator because the conduit to the scoreboard was

14   unusable, $1,250.  Does Coakley believe that United

15   Sheet Metal is responsible for this particular

16   back-charge?

17       A.    I don't know the structure of the

18   agreement between United Sheet Metal and Limbach,

19   so I don't know what their scope of work was.

20       Q.    Do you understand why Coakley believes

21   Limbach is responsible for this back-charge?



Page 164

1    A.    Probably because they were supposed to

2    provide the scoreboard operator.

3    Q.    To your knowledge, did Coakley provide

4    Limbach written notice of their intent to

5    back-charge Limbach for this scoreboard operator?

6    A.    I would have to check the record.

7    Q.    Item 7 is Mahogany, Inc., overtime

8    premium for completion of the millwork

9    installation, $4,314.  Why does Coakley believe

10   that Limbach is responsible for this particular

11   back-charge?

12   A.    Couldn't finish the ductwork in the band

13   support rooms so that we could have the follow-on

14   trades.  Plus, the, as stated earlier, the main

15   mechanical room in the band support never got

16   completed until early June to where we could have

17   conditioned air running through that building,

18   which Mahogany needed to be able to install their

19   materials, and in order to get to the end of the

20   project by the end of June, we had to pay Mahogany

21   overtime money.

Art Miller & ASSOCIATES L.L.C.
COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883    WASHINGTON FAX: 202-234-8467
www.artmiller.com

Page 165

1    Q.   Did you send Limbach written notification

2  stating that you were going to have to pay Mahogany

3  overtime money because of Limbach's delays in

4  completing the mechanical room?

5    A.   I would have to check the record, but

6  specifically, I don't know.  I know they were put

7  on notice that the people were not performing and

8  that we would have to do whatever it took to get

9  done.

10    Q.   Item number 8 relates to a C.R. Calderon

11  back-charge associated with NEP drywall and ceiling

12  repairs in the amount of $33,257.  What is this

13  back-charge for?

14    A.   This goes back to some of the things I

15  related to you.  Item number 1, drywall work that

16  had to be repaired and corrected after Limbach or

17  their subcontractors were in ceilings or walls.

18    Q.   How much of this back-charge relates to

19  electrical work that had to be performed in the

20  ceilings and the walls after the fact?

21    A.   I would have to check the tickets.

1      Q.    Do you know how much of this back-charge

2  relates to ductwork that had to be performed in the

3  ceilings and walls after the fact?

4      A.    I would have to check the tickets.

5      Q.    Did Coakley provide written notification

6  to Limbach that back-charges from C.R. Calderon

7  would be assessed against Coakley for the drywall

8  and ceiling repairs?

9      A.    Assessed against Limbach?

10     Q.    Yes.  Excuse me.

11     A.    At some point, yes.

12     Q.    Do you know when?

13     A.    I would have to check the record.

14     Q.    In item 9, it looks like we have overtime

15 costs of $25,000 paid to C.R. Calderon to perform

16 this drywall ceiling, door frames and hardware

17 repairs.  Is this the same work that's associated

18 with item 8?

19     A.    No.  It probably would be something --

20 well, it might be some of it, and also, it might be

21 some just to complete the band support rooms.  I

Page 167

1    would have to check the backup.

2        Q.    Again, did Coakley provide Limbach

3    written notification that it was going to be paying

4    overtime to C.R. Calderon and that Coakley expected

5    Limbach to be responsible for those costs?

6        A.    Yes, in some form.

7        Q.    Sun Belt Rentals, item 10, Provide

8    temporary dehumidification in BEQ and band

9    building.  Do you know what this back-charge is

10   about?

11       A.    Yeah.  Ten and 11 relate to the fact that

12   we could not get conditioned air into the building

13   as required, so we had to go out and rent equipment

14   to bring, to start to bring the building into

15   compliance so we could complete our finishes.

16       Q.    To your knowledge, when was the building

17   closed in?

18       A.    The band support room -- the band support

19   and the BEQ was closed in sometime during the early

20   part of '04.

21       Q.    And when did you believe temporary heat

Page 168

1    should be available in these buildings?

2        A.    Actually, it was supposed to be available

3    in the Fall of '03.

4        Q.    Well, if the building was not closed in

5    until January of '04, how would you get temporary

6    heat in the building before then?

7        A.    You can still run the heat.  You put in

8    temporary enclosures, windows, doors, whatever it

9    might be, to be able to still run the systems.

10       Q.    Is that what Coakley did?

11       A.    Well, we had to use temporary equipment

12   because the, as I said, the main equipment in the

13   band support never got started up until June of

14   '04.

15       Q.    How about the temporary dehumidification?

16       A.    Well, by providing conditioned air,

17   you're dehumidifying, but that didn't happen, so.

18       Q.    So when was this dehumidification

19   provided?

20       A.    That would have been done in the Spring

21   of '04 in the band support area, because you need

Page 169

1    to pull the moisture out of those rooms where we're

2    putting wood finishes.

3        Q.   To your knowledge, did Coakley provide

4    Limbach written notification that they were going

5    to back-charge Limbach for this temporary

6    dehumidification cost?

7        A.   Yes.

8        Q.   To your knowledge, did Coakley provide

9    Limbach written notification that they were going

10   to back-charge Limbach for the temporary heat

11   costs?

12       A.   Yes.

13       Q.   Item 12 relates to ACI, additional

14   scheduling costs.  What is this back-charge for?

15       A.   Costs of additional scheduling services.

16       Q.   What are those?

17       A.   Related to the delay.

18       Q.   What delay?

19       A.   Caused by Limbach or their subcontractors

20   in having to resequence.

21       Q.   I'm not sure I understand.  What schedule

*Art Miller* & ASSOCIATES L.L.C.

COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883    WASHINGTON FAX: 202-234-8467
www.artmiller.com

1   work had to be resequenced because of delay caused

2   by Limbach and their subcontractors?

3       A.   Whatever work was related to the work

4   that was behind.

5       Q.   Is it your contention that none of these

6   costs involve the time spent by HCI Consultants to

7   prepare the weather-delay claim analysis or the

8   owner-delay claim analysis?

9       A.   I would have to look to see what supports

10  that number.

11      Q.   If any of these costs were expended by

12  Coakley for the work performed by HCI to do the

13  weather-delay claim analysis or the owner-delay

14  claim analysis, do you believe that Limbach should

15  be back-charged for those costs?

16      A.   They would have to be adjusted out of

17  that number.

18      Q.   At the time that Coakley entered into its

19  subcontract with Long Fence, did you contemplate

20  that there might be a need to trade off additional

21  work at the end of the job to avoid liquidated

Page 171

1    damages because of alleged costs by Limbach?

2        A.    Yes.

3        Q.    Isn't it true that the contract that you

4    had with the owner contemplates assessment of

5    liquidated damages?

6        A.    You already pointed out that it did.

7        Q.    And Limbach was bound to that

8    liquidated-damage provision by a subcontract with

9    Coakley?

10            MR. CARNEY:  Objection.

11            THE WITNESS:  Yes.

12       Q.    So why not just have the liquidated

13   damages assessed and pass them on to Limbach?

14            MR. CARNEY:  Objection.

15            THE WITNESS:  It would not be something

16   that Coakley would want on our permanent record

17   with the Government, that a project we finished had

18   noted in it that liquidated damages had been

19   assessed.

20       Q.    Prior to --

21       A.    Plus, they were 90 some thousand dollars

1    as opposed to $36,000.

2        Q.    Prior to you making this agreement with

3    the Government to trade off certain costs of Long

4    Fence in exchange for the words liquidated damages

5    not being utilized against Coakley, did Limbach

6    provide any notification to, excuse me, did Coakley

7    provide any written notification to Limbach stating

8    that they were going to trade off these costs and

9    that they expected Limbach to be responsible for

10   this trade-off?

11       A.    We had some discussions about it.

12       Q.    When did you have those discussions?

13       A.    During the month of August at some point.

14       Q.    Of 2004?

15       A.    Um-hum, (Nodding head yes.)

16       Q.    Was there any written notification

17   provided?

18       A.    No.   It was just --

19       Q.    Did Limbach dispute responsibility for

20   these trade-off costs when you had this discussion?

21       A.    They knew there was going to be a

Art Miller & ASSOCIATES L.L.C.

COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883     WASHINGTON FAX: 202-234-8467
www.artmiller.com

Page 173

1    discussion about them.

2        Q.    Did they dispute any sort of

3    responsibility for trade-off costs in connection

4    with the waiver of liquidated damages?

5        A.    Did they specifically dispute?

6        Q.    Dispute.

7        A.    In total?

8        Q.    Yes.

9        A.    They knew they had a problem.

10       Q.    Who knew they had a problem?

11       A.    Mike Forti and Chris Richardson.

12       Q.    And did they express this knowledge to

13   you in writing?

14       A.    No.

15       Q.    They just expressed it verbally?

16       A.    Yes.

17       Q.    This was in August of 2004?

18       A.    Through the end of July and that first

19   week of August, there was a lot of discussion

20   ongoing about trying to get the building completed,

21   and one of the biggest issues was the commissioning



Art Miller & ASSOCIATES L.L.C.
COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883    WASHINGTON FAX: 202-234-8467
www.artmiller.com

Page 174

1    and finishing up what had to be done, and Mike came

2    to the site the one morning, Richardson was out

3    there, and that fellow Mike Maroney was on site, as

4    was myself almost probably ten, 14 hours a day

5    trying to get the building completed.

6        Q.    Item 15 is similar to item 13 in that it

7    relates to costs for additional landscaping work

8    that were traded off for liquidated damages.

9            Did Coakley provide Limbach written

10   notification that they were going to back charge

11   Limbach for these additional landscaping costs as a

12   trade-off for liquidated damages?

13       A.    I don't know.

14       Q.    Item 14 relates to part rug, repair

15   damage to Gypcrete floors, $16,600 divided by five

16   contractors, equals $3,320.  Who are the five

17   contractors?

18       A.    That would be Limbach, the mason, drywall

19   contractor, fire sprinkler and I don't know who the

20   fifth would be.  I would have to ask David who he

21   contemplated there.

Page 175

1    Q.   Who was the Gypcrete contractor?

2    A.   The contractor that furnished and sold

3    the Gypcrete.

4    Q.   Who was that?

5    A.   Oh.  That's a good question.  On this

6    job, I don't know.  I would have to check the

7    record.

8    Q.   Why didn't he protect his own floors?

9    A.   They wouldn't normally protect their own

10   materials.  After they put it in, they expect it to

11   be done, but what probably occurred here is that

12   even though the trades said they were complete and

13   we would Gypcrete the floor and go on to the finish

14   work, that was not the case and the trades would

15   get back on the floor and finish their work.

16   Q.   To your knowledge, did, during the course

17   of the project, did Coakley notify Limbach in

18   writing that they were going to assess Limbach a

19   portion of the cost to repair the Gypcrete floors?

20   A.   I would have to check the record.

21   Q.   Item 16 relates to some insulation costs,

1    repair damage, fireproofing, $3,300. What is this

2    back-charge for?

3         A.   Damage to the fireproofing that was,

4    needed to be repaired.

5         Q.   Do you know who caused the damage?

6         A.   Based on Chris's note there, it says

7    mechanical rooms, and I'm assuming that's where it

8    is.

9         Q.   Do you know who actually caused the

10   damage?

11        A.   No, I don't, but it's in the mechanical

12   room. So it probably relates to work associated

13   with Limbach.

14        Q.   To your knowledge, did Coakley during the

15   course of the project notify Limbach that it was

16   going to be assessing costs against Limbach for

17   repair to damaged fireproofing?

18        A.   Specifically, I don't know. I would have

19   to check the record.

20        Q.   Have any of these items, these 16 items

21   of charges been assessed to any of Coakley's other

Page 194

1       A.    Not that I understand to be, no.

2       Q.    You're aware that United Sheet Metal has

3    also sued Coakley Williams on the payment bond that

4    Coakley provided to the project?

5             MR. SHEAN:   Yes, but this deposition is

6    being taken in conjunction with the Superior Court

7    action.   We have yet to file our responsive

8    pleadings.   We have not filed our answer, have not

9    filed anything, so I'm not going to have him

10   testify with respect to that, and that was the

11   understanding that I had with Scott with regard to

12   this deposition.

13      Q.    Well, what I wanted to ask you, it's

14   nothing related to that action, but I just want to

15   ask you has Coakley requested Limbach to handle the

16   defense of that action?

17      A.    We would in accordance with our contract.

18      Q.    As of today, has any action been filed by

19   Limbach against Coakley?

20      A.    No.

21      Q.    When does Coakley intend to resolve these

1    back-charge issues with Limbach?

2        A.    Whenever there's someone from Limbach

3    that steps forward that we can talk to.

4        Q.    Has there been any effort made since the

5    August 25th, 2005 meeting to find out who from

6    Limbach could do that?

7        A.    We understand there's a fellow by the

8    name of Charlie Sasser that's taken over the

9    office.  I've asked should we contact him.  I was

10   told he'll contact us, so.

11       Q.    Has he made any effort to contact Coakley

12   yet?

13       A.    Not that I'm aware of on 8th and I.  He

14   might be talking to us on other projects, but not

15   on this one.

16            MR. JONES:  The good news is I think I'm

17   going to skip the rest of this stuff.

18            MR. SHEAN:  I'm sorry?

19            MR. JONES:  The good news is I think I'm

20   going to skip the rest of the boxes.  With that, I

21   want to take a couple of minutes and see if there's

Art Miller & ASSOCIATES L.L.C.

COURT REPORTERS AND VIDEOGRAPHERS
BALTIMORE FAX: 410-385-1883    WASHINGTON FAX: 202-234-8467
www.artmiller.com